UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| GREEN REVOLUTION COOLING, INC. § <br> § <br> Plaintiff, § <br> § <br> vs. § <br> § <br> POWERSPEC INC. and § <br> RAPTOR POWER SYSTEMS LLC § <br> § <br> Defendants. § | Case No. 1:19-cv-00994-RP |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

COMES NOW Green Revolution Cooling, Inc. ("GRC" or "Plaintiff") complaining of Powerspec Inc. ("Powerspec") and Raptor Power Systems LLC ("Raptor" and collectively with Powerspec, "Defendants"), and for cause would respectfully show the Court the following:

**I.**

**PARTIES**

1. GRC is a Delaware corporation with its principal place of business in Austin, Texas. GRC is a consumer that sought and acquired by purchase goods and services for business or commercial use. GRC has assets of less than $25 million and is not owned or controlled by an entity with assets of $25 million or more.

2. Defendant Powerspec is a corporation organized and existing under the laws of New Jersey, with a principal place of business in Somerville, NJ. Powerspec has been served and has appeared in this action.

3. Defendant Raptor is an Illinois limited liability company, with a principal place of business in Mahomet, Illinois. Raptor has been served and has appeared in this action.

- 1 -

## II.

## JURISDICTION AND VENUE

4. This Court has jurisdiction of these claims and parties pursuant to 28 U.S.C. § 1332 because this is a suit between citizens of different states and the matter in controversy exceeds $75,000.

5. This Court has personal jurisdiction over Defendants because the parties' contract was negotiated and executed by Plaintiff in Texas, because the acts and omissions that gave rise to this suit occurred in Texas, and because the contract was performed by all parties in Texas. Defendants have purposefully availed themselves of the benefits and privileges of conducting business in Texas by, among other things, engaging in extensive communications and negotiations with a Texas entity to sell and deliver goods to Texas; pursuing and entering into a long-term contractual relationship with a Texas entity that contemplated and required repeated performance by Defendants within the state of Texas; communicating warranties to a Texas entity for goods sold and delivered to Texas; and engaging in false, misleading, or deceptive acts that a Texas entity relied on to its detriment. Defendants' Texas contacts give rise to, and are directly related to, the claims alleged in this action.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## III.

## FACTUAL BACKGROUND

7. GRC provides cooling technology for data centers worldwide, utilizing innovative liquid immersion cooling solutions to allow companies to increase their computing ability. One industry in which GRC's immersion cooling technology is currently being utilized is

cryptocurrency mining. Cryptocurrency miners essentially validate cryptocurrency transactions by performing mathematical equations and, in return, earn cryptocurrency. Advanced cooling systems like GRC's allow cryptocurrency miners to mine more quickly and profitably because they lower the energy costs associated with mining and minimize the risk of overheating and damage to equipment.

8.  In October 2017, GRC issued a request for quotation for custom power distribution units ("PDUs") to incorporate into its cooling system for data centers engaged in cryptocurrency mining. PDUs distribute, manage, and control electric power within a data center environment. In order to be usable in the cryptocurrency mining environment, the PDUs sought by GRC needed to have certain specific characteristics, including that they allow remote monitoring, enable and disable the power to power sockets, be capable of supporting a CE certification mark, and possess certain total power measurements.

9.  GRC spoke to approximately ten companies regarding its request for quotation, including Defendant Raptor, which manufactures, among other things, custom PDUs for cryptocurrency mining. Raptor's website promotes its experience with and specialization in custom PDUs and, specifically, cryptocurrency mining PDUs. Raptor's website is a fully interactive website through which potential customers from all over the country, including Texas, can transact business with Raptor.

10.  After a number of communications with Raptor, during which Raptor represented that it could design and manufacture custom PDUs that complied with the specific requirements GRC was seeking, GRC decided to proceed with Raptor. During these communications, GRC communicated to Raptor, and Raptor understood, that the PDUs would need to be shipped to GRC's facilities in Texas because GRC and its partner manufacturing site were located in Texas.

At all times, GRC participated in these communications from Texas.

11. Negotiations with Raptor regarding the product requirements took place over several phone calls and email communications between Ron Slezak of GRC in Austin, Texas and the Raptor engineering and management team. On these calls, Mr. Slezak verbally gave the Raptor team specific design requirements, which were then memorialized and acknowledged by Raptor in written form.

12. Raptor provided to GRC in Texas a series of quotes for the PDUs sought by GRC. The quotes instructed that purchase orders be addressed to Raptor's parent company, Powerspec Inc. The quotes offered various PDU options, which the parties thereafter discussed and negotiated in accordance with GRC's stated needs and specifications. GRC relied on Raptor and Powerspec in the design, build-out, and manufacturing of the PDUs because of Raptor's represented experience and expertise with PDUs used for cryptocurrency mining. During these negotiations, GRC was not represented by an attorney.

13. Each of the quotes provided by Defendants contained an express two-year warranty which represented and warranted that the PDUs offered would be functional and further represented that support services would be provided. Based on GRC's request for quotation and the parties' discussions regarding the particular specifications GRC required for the PDUs, Raptor, and by extension, Powerspec, understood and impliedly warranted to GRC that the PDUs specifically needed to be functional and appropriate for use as part of GRC's cooling systems in the cryptocurrency mining environment. GRC relied on the Defendants' express and implied representations and warranties and purchased the PDUs in reliance on such representations and warranties.

14. GRC ultimately accepted the Raptor/Powerspec quotes, and the parties thereafter entered into a contractual relationship in the form of a series of Purchase Orders ("POs") and corresponding invoices issued by Defendants pursuant to which GRC purchased 41 PDUs. The POs each required that the PDUs be delivered to GRC in Texas. The POs and associated payments were addressed and made to Raptor's parent company, Powerspec, in New Jersey, at the request of Raptor. The POs were issued by GRC in Austin, Texas.

15. The invoices for the PDUs issued by Defendants each noted that the PDUs were to be billed to Green Revolution Cooling at 11525 Stonehollow Drive in Austin, Texas. The invoices were sent by Defendants to GRC in Austin, Texas. The invoices further stated that the PDUs would each be shipped to Texas. At least one of the invoices contained additional representations and warranties by Raptor/Powerspec that certified that "the materials, parts and/or processes furnished per the above referenced purchase order, have been manufactured in accordance with applicable drawings, specifications and instructions" among other things. GRC relied on these additional representations and warranties and purchased the PDUs in reliance on such representations and warranties, as well as Defendants' other representations and warranties.

16. Throughout the parties' discussions and negotiations, Defendants understood that GRC was a Texas company, that their contractual obligations involved delivering the PDUs to Texas, and that they were pursuing a long-term relationship with a Texas company. Defendants further directed their misrepresentations and warranties to GRC in Texas.

17. Defendants delivered the Raptor/Powerspec PDUs to Texas over multiple shipments in 2018 in accordance with the contractual terms. The parties also continued to have communications regarding the PDUs while GRC was in Texas.

18. After receiving the PDUs in Texas, GRC installed over thirty of the Raptor/Powerspec PDUs in several data centers worldwide, including in Colorado, Florida, and Spain. A small number of the other purchased PDUs were never ultimately installed because by the time they were received, GRC had discovered that the earlier-received PDUs were faulty and the later-received PDUs had the same problems.

19. The Raptor/Powerspec PDUs had significant problems that were apparent almost immediately. Some of the PDUs would not power on at all, others only partially powered, and others would power on for a short while and then fail. Some of the PDUs were not accessible from the internet, which was necessary to provide remote reporting of the conditions of the data center's power and the functioning of the cooling system. Certain of the PDUs also had internal wiring problems that resulted in connection failures that were needed to be fixed locally in Texas. At best, the PDUs worked intermittently, and at worst, they were entirely non-functional. Ultimately, GRC was forced to halt installation of the Raptor/Powerspec PDUs because of these issues.

20. GRC also has learned that the Raptor/Powerspec PDUs may not be compliant with applicable United States and/or European regulations including because of the type of circuit breaker used by Defendants within the PDUs.

21. GRC took various steps to try to resolve the issues with Raptor and Powerspec. From the outset when the PDUs were first installed, GRC and its customers repeatedly reached out to Raptor and Powerspec to fix the quality and functionality issues they were facing with the PDUs. Defendants provided very poor service and were largely unresponsive to these requests. Rather than abiding by their contractual obligations, representations, and warranties and fixing the persistent issues with the PDUs, Raptor and Powerspec repeatedly deflected blame for the problems with the PDUs, often requiring GRC and its customers to shoulder the cost and effort to

fix the PDUs. GRC incurred significant expenses to try to fix the PDU problems, including extended installation times, shipping charges, rework expenses, and employee costs.

22. Ultimately, the problems with the PDUs were not fixed by Raptor or Powerspec, and GRC was forced to cease use of all the installed Raptor/Powerspec PDUs in its customer data centers. GRC removed and replaced the majority of the faulty Raptor/Powerspec PDUs from its customer data centers, while the remaining installed PDUs were decommissioned. The replacement PDUs that GRC was forced to obtain from another manufacturer were more expensive, and GRC incurred a great deal of expense to remove and replace the faulty PDUs.

23. These issues with the Raptor/Powerspec PDUs impacted GRC's customer's productivity and GRC's reputation with its customers. GRC's cryptocurrency miner customers have claimed to GRC that they have suffered large opportunity costs because of the problems with the Raptor/Powerspec PDUs. GRC has, in turn, had to deal with customer dissatisfaction because of the faulty PDUs, which has directly resulted in at least three lost orders to GRC. GRC estimates that these three lost orders alone have resulted in total lost revenue to GRC of over $3 million, on which GRC would have stood to profit over $1 million.

24. GRC sent Defendants a formal notice and demand for reimbursement for the PDUs in December 2018. In that notice, GRC set out the issues it was facing with respect to the PDUs and requested a refund of all the PDUs it had purchased from Defendants, as well as compensation for incidental expenses. Some examples of the issues noted in the December 2018 notice included: the PDUs failed to supply power to outlets; the PDUs did not report the correct amount of power; incorrect wiring; and Defendants applied fixes that only worked for a short time or not at all. This notice sufficiently gave Defendants due notice of their breaches, including their breaches of warranty. GRC received no response to its notice from Defendants, and Defendants have taken

no steps to reimburse GRC or otherwise remedy the situation.

25. On September 10, 2019, GRC sent Defendants pre-suit notice of its claims pursuant to the Texas Deceptive Trade Practices-Consumer Protection Act.

26. GRC has been forced to employ the services of the undersigned attorneys to represent it in this action. GRC therefore seeks recovery of attorneys' fees.

## IV.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION – BREACH OF CONTRACT UNDER THE UNIFORM COMMERCIAL CODE

27. Plaintiff hereby incorporates by reference the allegations contained above as if fully set forth herein.

28. As described above, Defendants entered into a valid and enforceable contractual relationship with GRC, whereby Defendants contracted to design, manufacture, and supply custom PDUs for use in Plaintiff's customers' data centers for use in cryptocurrency mining. The custom PDUs were supposed to be designed and manufactured based on Plaintiff's specified requirements and function in accordance with those requirements. Defendants committed material breaches by failing to provide PDUs that were in accordance with the agreed-upon contractual terms.

29. As part of the parties' contractual relationship and attendant to the sale of the PDUs, Defendants also contracted to provide support services to GRC for the PDUs. Defendants committed additional material breaches by failing to adequately provide these support services. Defendants repeatedly failed to timely respond and remedy the issues complained of by GRC and GRC's customers.

30. To the extent the PDUs are not fully compliant with applicable regulations, Defendants have committed additional material breaches.

31. While GRC initially accepted delivery of the PDUs, after realizing their faulty nature, GRC sent Defendants notice in December 2018 demanding reimbursement for the PDUs, as well as reimbursement for incidental expenses GRC was forced to incur to remove and replace the installed PDUs.

32. Plaintiff has performed its contractual obligations.

33. All conditions precedent have been performed or have occurred.

34. Defendants' breaches have proximately caused Plaintiff damages.

35. Plaintiff seeks recovery of its actual damages as well as all incidental and consequential damages to which it is entitled. Plaintiff also is entitled to and seeks recovery of its reasonable attorneys' fees and costs.

### SECOND CAUSE OF ACTION – BREACH OF EXPRESS WARRANTY UNDER THE UNIFORM COMMERCIAL CODE

36. Plaintiff hereby incorporates by reference the allegations contained above as if fully set forth herein.

37. Defendants provided an express two-year warranty for the PDUs and related support services.

38. Defendants further represented and warranted that the PDUs were manufactured in accordance with GRC's specifications and instructions.

39. These representations and warranties made by Defendants became part of the parties' bargain.

40. Plaintiff relied on Defendants' express warranties and representations and purchased the PDUs in reliance on those warranties and representations.

41. The PDUs and Defendants' support services were not of the character warranted by Defendants because the PDUs either did not work or worked poorly, they were not designed and

did not perform in accordance with Plaintiff's stated specifications, and the support services provided by Defendants were inadequate and, at times, non-existent.

42. Plaintiff has repeatedly informed and notified Defendants of the issues with the PDUs, and Defendants have failed to remedy the issues.

43. As a direct and proximate result of Defendants' breaches of express warranty, Plaintiff has suffered damages, including incidental and consequential damages. Plaintiff also is entitled to and seeks recovery of its reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE UNIFORM COMMERCIAL CODE

44. Plaintiff hereby incorporates by reference the allegations contained above as if fully set forth herein.

45. Defendants are merchants of PDUs and sold the PDUs to GRC.

46. Defendants impliedly warranted to Plaintiff that its PDUs would be merchantable.

47. Plaintiff relied on Defendants' implied warranty of merchantability in reaching a decision to purchase Defendants' PDUs.

48. Defendants breached their implied warranty of merchantability by providing PDUs that were not merchantable and not fit for their ordinary purposes. The PDUs were defective from the time they left Defendants' possession, which was evident once GRC installed a representative sample of them in GRC's customers' data centers because some of them did not work as intended and others did not work at all.

49. GRC notified Defendants of these defects numerous times, including in its December 2018 notice.

50. As a direct and proximate result of Defendants' breach of their implied warranty of merchantability, Plaintiff suffered damages, including incidental and consequential damages. Plaintiff also is entitled to and seeks recovery of its reasonable attorneys' fees and costs.

### FOURTH CAUSE OF ACTION – BREACH OF IMPLIED WARRANTY: FITNESS FOR PARTICULAR PURPOSE UNDER THE UNIFORM COMMERCIAL CODE

51. Plaintiff hereby incorporates by reference the allegations contained above as if fully set forth herein.

52. Defendants sold the PDUs to GRC.

53. At all times, including at the time of contracting, Defendants had reason to know the particular purpose for which Plaintiff required the PDUs—namely, for use in GRC's customers' data centers for cryptocurrency mining.

54. At all times, including at the time of contracting, Defendants had reason to know that Plaintiff was relying on Defendants' experience, skill, and expertise in designing, selecting, manufacturing, and applying to Plaintiff's particular purpose adequate and suitable PDUs for Plaintiff's stated use at its customers' data centers for cryptocurrency mining.

55. Defendants impliedly warranted that the PDUs it sold Plaintiff would be fit for the particular purpose for which Plaintiff required them.

56. Plaintiff actually and justifiably relied on Defendants' experience, skill, and judgment to furnish suitable goods.

57. Defendants breached their implied warranty by providing PDUs that were not fit for the particular purpose for which Plaintiff required them.

58. GRC notified Defendants of the breach after discovering that the PDUs were not fit for the particular purpose for which Plaintiff required them, including in its December 2018 notice.

59. As a direct and proximate result of Defendants' breach of their implied warranty, Plaintiff suffered damages, including incidental and consequential damages. Plaintiff also is entitled to and seeks recovery of its reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION – TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT

60. Plaintiff hereby incorporates by reference the allegations contained above as if fully set forth herein.

61. Plaintiff is a consumer under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") because it is a corporation that sought and acquired by purchase goods and services for commercial or business use. Plaintiff has assets of less than $25 million and is not owned or controlled by an entity with assets of $25 million or more.

62. Defendants are entities that can be sued under the DTPA.

63. Defendants violated the DTPA by engaging in false, misleading, or deceptive acts or practices that Plaintiff relied on to its detriment.

64. Defendants represented that the PDUs and associated services by Defendants had characteristics that they did not have. Defendants further represented that the PDUs and associated services by Defendants met GRC's required specifications, including that they would power on, supply power to the power outlets, and be capable of remote management, and the PDUs and services did not meet those specifications. Defendants also represented that the warranties they provided on the PDUs and necessary associated services conferred rights or remedies which they

did not. Defendants further falsely represented that they performed repairs or services on the faulty PDUs when they did not perform such repairs or services.

65. Defendants further violated the DTPA because they breached their express warranty and the implied warranty of fitness for a particular purpose which Defendants owed to Plaintiff.

66. Defendants provided express warranties for the PDUs and associated support services. The PDUs did not function as promised, did not meet Plaintiff's specifications, and Defendants did not adequately perform the required repairs.

67. At the time of contracting, Defendants knew that Plaintiff required custom PDUs that conformed to their stated requirements for use in data centers engaged in cryptocurrency mining and that Plaintiff was relying on Defendants' expertise and experience to design and furnish such customized PDUs. The PDUs, however, were not fit for this purpose.

68. Defendants engaged in the foregoing conduct knowingly and intentionally and acted with the specific intent that Plaintiff detrimentally rely on their false, deceptive, and unfair acts and practices.

69. On September 10, 2019, Plaintiff gave written notice to Defendants advising them of Plaintiff's specific complaints and the amount of damages, including reasonable attorneys' fees, incurred by Plaintiff as of the date of the letter.

70. As a result of Defendants' knowing and wrongful conduct, Plaintiff has suffered economic damages, including in the form of lost profits, lost sales, lost revenues, out-of-pocket expenses, and cover damages.

71. As a result of Defendants' knowing and intentional conduct, Plaintiff is entitled to recover additional damages in an amount not to exceed three times the amount of economic damages.

72. Plaintiff also is entitled to and seeks recovery of its reasonable attorneys' fees and costs.

## V.

## JURY DEMAND

73. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

## VI.

## PRAYER FOR RELIEF

WHEREFORE PREMISES CONSIDERED, Plaintiff respectfully requests that Defendants be cited to appear, and that judgment be rendered against Defendants for:

a. Actual and compensatory damages, including all incidental and/or consequential damages;

b. Economic damages, including all incidental and/or consequential damages;

c. Additional damages in an amount not to exceed three times the amount of economic damages;

d. Pre-judgment and post-judgment interest;

e. Court costs;

f. Attorneys' fees;

g. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

**REEVES & BRIGHTWELL LLP**


*/s/ Manasi Rodgers*
Kim Brightwell
State Bar No. 02992700
Manasi Rodgers
State Bar No. 24090361
221 W. 6th St., Ste 1000
Austin, TX 78701
Telephone: 512.334.4501
Fax: 512.334.4492
kbrightwell@reevesbrightwell.com
mrodgers@reevesbrightwell.com


**ATTORNEYS FOR PLAINTIFF GREEN REVOLUTION COOLING, INC.**


**CERTIFICATE OF SERVICE**

I hereby certify that on November 7, 2019, the above and foregoing document was served using the Court's ECF system and/or via U.S. Mail on the following counsel of record:

Gregory Godkin
Mark Rabe
Roberts Markel Weinberg Butler Hailey PC
317 Grace Lane, Suite 140
Austin, TX 78746
ggodkin@rmwbh.com
mrabe@rmwbh.com

Corey LaBrutto
Nissenbaum Law Group, LLC
2400 Morris Avenue, Suite 301
Union, NJ  07083
cl@gdnlaw.com

*/s/ Manasi Rodgers*
Manasi Rodgers